Robert D. Shoecraft [California Bar No. 96217]
Rachael Kelley [California Bar No. 292718
rshoecraft@sbcivillaw.com
rkelley@sbcivillaw.com
SHOECRAFT BURTON, LLP
750 B. Street, Suite 2610
San Diego, CA 92101
Telephone (619) 794-2280
Facsimile (619) 794-2278

ATTORNEYS FOR PLAINTIFFS

Patrick J. Mendes [California Bar No. 181274]
David P. Ramirez. [California Bar No. 137994]
Chandra A. Roam [Bar No. 323379]
TYSON & MENDES LLP
5661 La Jolla Blvd.
La Jolla, CA 92037
Phone: (858) 459-4400
Fax: (858) 459-3864

ATTORNEYS FOR DEFENDANTS

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

| | |
|---|---|
| MCI COMMUNICATIONS SERVICES, INC. and MCIMETRO ACCESS TRANSMISSION SERVICES CORP., <br><br> Plaintiffs, <br><br> vs. <br><br> SKANSKA-TAYLOR-SHEA, a joint venture; SKANSKA USA CIVIL WEST CALIFORNIA DISTRICT, INC.; J.F. SHEA CONSTRUCTION, INC.; and TRAYLOR BROS, INC., <br><br> Defendants. | **Case No. 5:19-cv-01294-DSF-KK** <br><br><br> **[PROPOSED] STIPULATED PROTECTIVE ORDER** |

1.    A.    PURPOSES AND LIMITATIONS

Discovery in this action is likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted. Accordingly, the parties hereby stipulate to and petition the Court to enter the following Stipulated Protective Order. The parties acknowledge that this

Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles. The parties further acknowledge, as set forth in Section 12.3, below, that this Stipulated Protective Order does not entitle them to file confidential information under seal; Civil Local Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal.

### B.   GOOD CAUSE STATEMENT

Plaintiffs MCI Communications Services, Inc. and MCImetro Access Transmission Services Corp. (collectively "MCI") possess certain confidential and proprietary information and/or documents relating to the subject matter of this action which, in the course of discovery, MCI may need to disclose or produce to Defendants.

This information and/or the documents containing this information concern the direct and root causes of the damage to MCI's underground telecommunications cable and/or networks that gives rise to this action, the duration of the disruption to MCI's networks, the range and types of services affected, the scope and gravity of the impact across all platforms and geographic areas, specific equipment failures, the specific network elements impacted, remedial measures and/or best practices applied, and/or an appraisal of the effectiveness of those best practices.

The Federal Communications Commission (the "FCC") and the Department of Homeland Security (the "DHS") have concluded that such information could be used by hostile parties to attack MCI's telecommunications network that is a vital part of the Nation's critical information infrastructure and that the disclosure of such information to the public could present an unacceptable risk of more effective

terrorist activity.  <u>See</u> <u>In the Matter of New Part 4 of the Commission's Rules</u> <u>Concerning Disruptions to Communications</u>, FCC 04-188, ET Docket No. 04-35, Report and Order and Further Notice of Proposed Rule Making (Released Aug. 19, 2004) at ¶¶ 3,10-12, 40 (hereinafter the "FCC Order") (relevant portions attached as Exhibit 1).

In the course of discovery it may be also be necessary for MCI to disclose or produce to Defendants certain confidential or proprietary information, and/or documents containing confidential or proprietary information, regarding the identities of specific customers affected by the damage to the cable and the types of, amounts of, and durations, those customers' services were impacted.

The FCC has concluded that, given the highly competitive nature of the telecommunications industry and the use MCI's competitors could make of such information, the disclosure of such information creates a presumptive likelihood of substantial competitive harm.  <u>See</u> FCC Order (Exhibit 1) at ¶¶ 42-45.

In light of these circumstances, MCI believes good cause exists for the entry of the Protective Order to ensure that such information or documents are not disclosed to third parties or used for any purpose other than this litigation.

2.    <u>DEFINITIONS</u>

2.1    <u>Action</u>:  this pending federal law suit.

2.2    <u>Challenging Party</u>:    a Party or Non-Party that challenges the designation of information or items under this Order.

2.3    <u>"CONFIDENTIAL" Information or Items</u>: information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c), and as specified above in the Good Cause Statement.

2.4    Counsel: Outside Counsel of Record and House Counsel (as well as their support staff).

2.5    Designating Party: a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL."

2.6    Disclosure or Discovery Material: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2.7    Expert: a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this Action.

2.8    House Counsel: attorneys who are employees of a party to this Action. House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.9    Non-Party: any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

2.10    Outside Counsel of Record: attorneys who are not employees of a party to this Action but are retained to represent or advise a party to this Action and have appeared in this Action on behalf of that party or are affiliated with a law firm which has appeared on behalf of that party, and includes support staff.

2.11    Party: any party to this Action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staffs).

2.12    Producing Party: a Party or Non-Party that produces Disclosure or Discovery Material in this Action.

2.13 <u>Professional Vendors</u>: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.14 <u>Protected Material</u>: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL."

2.15 <u>Receiving Party</u>: a Party that receives Disclosure or Discovery Material from a Producing Party.

3. <u>SCOPE</u>

The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material.

Any use of Protected Material at trial shall be governed by the orders of the trial judge. This Order does not govern the use of Protected Material at trial.

4. <u>DURATION</u>

Even after final disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this Action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this Action,

including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

5.    DESIGNATING PROTECTED MATERIAL

    5.1    Exercise of Restraint and Care in Designating Material for Protection. Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards. The Designating Party must designate for protection only those parts of material, documents, items, or communications that qualify – so that other portions of the material documents, items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order.

    Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber the case development process or to impose unnecessary expenses and burdens on other parties) may expose the Designating Party to sanctions.

    If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection, that Designating Party must promptly notify all other Parties that it is withdrawing the inapplicable designation.

    5.2    Manner and Timing of Designations. Except as otherwise provided in this Order (see, e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

(a)   for information in documentary form (e.g., paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix at a minimum, the legend "CONFIDENTIAL" (hereinafter "CONFIDENTIAL legend"), to each page that contains protected material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

A Party or Non-Party that makes original documents available for inspection need not designate them for protection until after the inspecting Party has indicated which documents it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "CONFIDENTIAL." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the "CONFIDENTIAL legend" to each page that contains Protected Material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

(b)   for testimony given in depositions that the Designating Party identify the Disclosure or Discovery Material on the record, before the close of the deposition all protected testimony.

(c)   for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information is stored the

legend "CONFIDENTIAL." If only a portion or portions of the information warrants protection, the Producing Party, to the extent practicable, shall identify the protected portion(s).

5.3     Inadvertent Failures to Designate. If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

6.     CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1     Timing of Challenges. Any Party or Non-Party may challenge a designation of confidentiality at any time that is consistent with the Court's Scheduling Order.

6.2     Meet and Confer. The Challenging Party shall initiate the dispute resolution process under Local Rule 37.1 et seq.

6.3     The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived or withdrawn the confidentiality designation, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the Court rules on the challenge.

7.    ACCESS TO AND USE OF PROTECTED MATERIAL

7.1    Basic Principles. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this Action only for prosecuting, defending, or attempting to settle this Action. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the Action has been terminated, a Receiving Party must comply with the provisions of section 13 below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

7.2    Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a)   the Receiving Party's Outside Counsel of Record in this Action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this Action;

(b)   the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this Action;

(c)   Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit 2);

(d)   the court and its personnel;

(e)   court reporters and their staff;

(f)   professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit 2);

(g)   the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information;

(h)   during their depositions, witnesses, and attorneys for witnesses, in the Action to whom disclosure is reasonably necessary provided: (1) the deposing party requests that the witness sign the form attached as Exhibit 2 hereto; and (2) they will not be permitted to keep any confidential information unless they sign the "Acknowledgment and Agreement to Be Bound" (Exhibit 2), unless otherwise agreed by the Designating Party or ordered by the court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material may be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order; and

(i)   any mediator or settlement officer, and their supporting personnel, mutually agreed upon by any of the parties engaged in settlement discussions.


8.   <u>PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION</u>

If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this Action as "CONFIDENTIAL," that Party must:

(a)   promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b)   promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the

subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this Action to disobey a lawful directive from another court.

9. NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION

(a) The terms of this Order are applicable to information produced by a Non-Party in this Action and designated as "CONFIDENTIAL." Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b) In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

(1)    promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

(2) promptly provide the Non-Party with a copy of the Stipulated Protective Order in this Action, the relevant discovery request(s), and a reasonably specific description of the information requested; and

(3) make the information requested available for inspection by the Non-Party, if requested.

(c)    If the Non-Party fails to seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.


10.    UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit 2.

## 11. INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL

When a Producing Party gives notice to Receiving Parties that certain inadvertently produced material is subject to a claim of privilege or other protection, the obligations of the Receiving Parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). This provision is not intended to modify whatever procedure may be established in an e-discovery order that provides for production without prior privilege review. Pursuant to Federal Rule of Evidence 502(d) and (e), insofar as the parties reach an agreement on the effect of disclosure of a communication or information covered by the attorney-client privilege or work product protection, the parties may incorporate their agreement in the stipulated protective order submitted to the court.

## 12. MISCELLANEOUS

12.1   Right to Further Relief. Nothing in this Order abridges the right of any person to seek its modification by the Court in the future.

12.2   Right to Assert Other Objections. By stipulating to the entry of this Protective Order no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Stipulated Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

12.3   Filing Protected Material. A Party that seeks to file under seal any Protected Material must comply with Civil Local Rule 79-5. Protected Material may only be filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material at issue. If a Party's request to file Protected Material

under seal is denied by the court, then the Receiving Party may file the information in the public record unless otherwise instructed by the court.'

13.  FINAL DISPOSITION

After the final disposition of this Action, as defined in paragraph 4, within 60 days of a written request by the Designating Party, each Receiving Party must return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60 day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and (2)affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION).

14.  Any violation of this Order may be punished by any and all appropriate measures including, without limitation, contempt proceedings and/or monetary sanctions.

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

DATED ___11/11/19___

_____

Robert D. Shoecraft [California Bar No. 96217]
Rachael Kelley [California Bar No. 292718
_rshoecraft@sbcivillaw.com_
_rkelley@sbcivillaw.com_
SHOECRAFT BURTON, LLP
750 B. Street, Suite 2610
San Diego, CA  92101
Telephone (619) 794-2280
Facsimile (619) 794-2278

Attorneys for Plaintiffs


DATED: ___11/11/19___

_____

David P. Ramirez [California Bar No. 137994]
TYSON & MENDES
5661 La Jolla Blvd.
San Diego, CA  92037
Telephone:  (858) 459-4400
Facsimile:  (858) 459-3864

Attorneys for Defendants

FOR GOOD CAUSE SHOWN, IT IS SO ORDERED.


DATED:    January 24, 2020

_____
HON. KENLY KIYA KATO
UNITED STATES MAGISTRATE JUDGE

# Exhibit 1
# (FCC Order)

**Applicable Portions of**
**FCC 04-188, ET Docket No. 04-35**
Report and Order and Further Notice of Proposed Rule Making
**(Released Aug. 19, 2004)**

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| New Part 4 of the Commission's Rules | ) |
| Concerning Disruptions to Communications | )          ET Docket No. 04-35 |
| | ) |

**REPORT AND ORDER and FURTHER NOTICE OF PROPOSED RULE MAKING**

Adopted: **August 4, 2004**                    Released: **August 19, 2004**

**COMMENT DATE:**          [60 days after publication in the Federal Register]
**REPLY COMMENT DATE:**          [90 days after publication in the Federal Register]

**By the Commission:  Chairman Powell, Commissioners Abernathy, Copps, Martin and Adelstein
issuing separate statements.**

**Table of Contents**

|  |  | Paragraph No. |
|---|---|---|
| I. | Introduction and Executive Summary | 1 |
| | Executive Summary | 2 |
| II. | Extension of Mandatory Reporting Requirements for Communications Providers | 10 |
| | Background | 10 |
| | Proposal | 19 |
| | Comments | 20 |
| | Discussion | 32 |
| III. | Consistent Reporting | 48 |
| | A.  Common Metric | 48 |
| | Proposal | 48 |
| | Comments | 53 |
| | Discussion | 55 |
| | B.  Simplified Reporting for Special Offices and Facilities and 911 Services | 57 |
| | Proposal | 57 |
| | Comments | 60 |
| | Discussion | 64 |
| | C. Further Notice of Proposed Rule Making (Airports) | 67 |

provide voice and/or paging communications. As proposed, we adopt a common metric that will apply across all communications platforms in determining the general outage-reporting threshold criteria,[5] we will require electronic filing of all outage information through a "fill in the blank" template, and we will move the outage-reporting rule from existing section 63.100 to new Part 4 of our rules. We have applied the common metric as a basis for determining specific outage-reporting threshold criteria that account for the unique technical aspects of each communications platform.

       3.        The overwhelming majority of the commenting parties, including the Department of Homeland Security ("DHS"), have demonstrated that the outage reports will contain sensitive data, which requires confidential treatment under the Freedom of Information Act ("FOIA"). This data, though useful for the analysis of past and current outages in order to increase the reliability and security of telecommunications networks in the future, could be used by hostile parties to attack those networks, which are part of our Nation's critical information infrastructure. The disclosure of outage reporting information to the public could present an unacceptable risk of more effective terrorist activity. We therefore will treat the information that will be provided as confidential. This information will be withheld from disclosure to the public in accordance with the Freedom of Information Act. This action is the most significant revision to our original proposal that we have adopted in this *Report and Order*.

       4.        We have also adopted simplified criteria for reporting outages that potentially affect 911/E911 and other special offices and facilities. Currently, only major airports are included within the special office and facility outage-reporting criteria. We have expanded the coverage of the reporting requirement to include more airports, specifically those that are listed as primary (PR), commercial service (CM), and reliever (RL) airports in the FAA's National Plan of Integrated Airport Systems (NPIAS) (as issued at least one calendar year prior to the outage). To better address unique communications needs of airports, we have adopted a *Further Notice of Proposed Rule Making*. The *Further Notice* requests comment on additional types of airport communications that should be subject to service disruption reports and on whether reporting requirements should be extended to cover general aviation airports. In response to concerns raised by commenting parties about possible ambiguity in our proposed 911/E911 outage-reporting threshold criteria, we have adopted the following revised criteria:

(1) There is a loss of communications to PSAP(s) potentially affecting at least 900,000 user-minutes and: (a) the failure is neither at the PSAP(s) nor on the premises of the PSAP(s); (b) no reroute for all end users is available; and (c) the outage lasts 30 minutes or more; or

(2) There is a loss of 911 call processing capabilities in one or more E911 tandems/selective routers for at least 30 minutes duration; or

(3) One or more end-office or MSC switches or host/remote clusters is isolated from 911 service for at least 30 minutes and potentially affects at least 900,000 user-minutes; or

(4) There is a loss of ANI/ALI and/or a failure of location determination equipment, including Phase II equipment, for at least 30 minutes and potentially affecting at least 900,000 user-minutes (provided that the ANI/ALI or the necessary location determination equipment was then currently

---

[5] The common metric is the number of "user-minutes" potentially affected by an outage and is defined as the mathematical result of multiplying the outage's duration expressed in minutes and the number of users potentially affected by the outage. For example, a 30-minute outage that potentially affects 30,000 end users also potentially affects 900,000 user-minutes (30 minutes X 30,000 users = 900,000 user-minutes). The general threshold criteria are that an outage must be reported to the Commission if (a) its duration is at least 30 minutes; and (b) it potentially affects at least 900,000 user-minutes.

8.          Regarding major infrastructure failures, we have adopted our original proposal to require the reporting of all outages of at least 30 minutes duration that potentially affect at least 1,350 DS3 minutes. We observe that a DS3 is a communications highway that has been put in place to carry traffic in a digital format. That traffic can range, for example, from simple alarm and control circuits, to voice circuits, to radio and television programs, to circuits carrying ATM or credit card transactions, to FAA flight control circuits, to Department of Defense circuits, to circuits transferring billions of dollars from one Federal Reserve Bank to another, and to circuits critical to the operation of the stock and bond markets. Our concern is with the unavailability of significant portions of the communication highway regardless of how lightly or heavily those portions may be loaded at any particular time.[8] In addition, we have adopted our proposal to require SS7 providers to report significant outages because of the central importance of SS7 in much of the Nation's critical telecommunications infrastructure.

9.          Finally, we have modified our illustrative electronic filing process. We will provide a method for date and time stamping all report submissions, which also will be assigned a unique identifier or control number, and will provide other user-friendly features. We are currently investigating the proper level of security for the electronic system, which may include use of digital signatures and encryption.

## II. Extension of Mandatory Reporting Requirements for Communications Providers

10.          *Background.* The terrorist acts of September 11, 2001 starkly illustrate the need for reliable communications during times of crisis. First responders and medical personnel were notified by pagers, cellular telephones, wireline telephones, and the Internet of the tragic events that had occurred, and were occurring, and the immediate need for their services. When these services failed or were overwhelmed, first responders sometimes found themselves falling back on old fashioned "messenger" tactics. Long distance communications, including satellite communications, were used to initiate the movement of equipment and personnel into the affected areas for restoration purposes and to coordinate their work. All levels of government (municipal, county, state, and Federal) coordinated their restoration and Homeland Defense efforts through wireless and wireline phones, public data networks (including dial-up telephone, wireless, and cable modem access to the Internet),[9] and pagers. In this context, the need for immediate, secure, and reliable communications services is obvious.

11.          Somewhat less obvious is the extent to which our Nation has become completely dependent on communications services that are now essential to the operation of virtually all government, business, and critical infrastructures throughout the United States as well as to our Nation's economy.[10] One illustration should suffice, although many are available. Consider, for example, our financial infrastructure which, in large measure, consists of computers, databases, and communications links. If

---

[8] We are not asking carriers to determine the actual or potential impact of the outage on end users or on specific services that the DS3 may serve.

[9] We are using the phrase "public data network" to refer to a network that provides data communications for a fee to one or more unaffiliated entities. We are not adopting reporting requirements for public data networks at this time. We will, however, take this matter under advisement in light of the requests that were made by DHS, the City of New York, the National League of Cities, the National Association of Telecommunications Officers and Advisors and others. See DHS Comments at n.15; City of New York, the National League of Cities, and the National Association of Telecommunications Officers and Advisors ("City of New York *et al.*") Joint Comments at ii-iii, 10-11.

[10] The Communications Act defines the United States to include Alaska, the District of Columbia, Hawaii, the forty-eight contiguous Commonwealths and States, American Samoa, the Commonwealth of the Northern Mariana Islands, the Commonwealth of Puerto Rico, Guam, Howland Island, and the U.S. Virgin Islands. *See* 47 U.S.C. § 153(51).

the communications links were severed, or severely degraded, ATM machines would not be able to supply cash, credit card transactions would not "go through," banks would not be able to process financial transactions (including checks), and the financial markets would become dysfunctional.[11] In a short time, economic activity would grind to a halt and consumers' ability to purchase food, fuel or clothing would be severely limited if not destroyed. This single example leads, ineluctably, to the conclusion that the people of the United States must have secure communications that they can rely upon for their daily needs, as well as during terrorist attacks, fires, natural disasters (such as hurricanes, earthquakes, and tornadoes) and war.[12] Ensuring that the United States has reliable communications requires us to obtain information about communications disruptions and their causes to prevent future disruptions that could otherwise occur from similar causes, as well as to facilitate the use of alternative communications facilities while the disrupted facilities are being restored.

12.     The responsibilities of the Commission are stated in the Communications Act.[13] That Act states that the Commission was created for the "purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States . . . *a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities . . . for the purpose of the national defense, [and] for the purpose of promoting safety of life and property* through the use of wire and radio communication."[14] Section 4(o) of the Act also states "[f]or *the purpose of obtaining maximum effectiveness from the use of radio and wire communications in connection with safety of life and property*," the Commission "shall investigate and study all phases of the problem and the best methods of obtaining the cooperation and coordination of these systems.*"[15] And, to assist the Congress in performing its normal oversight responsibilities, the Act requires the "Commission [to] make an annual report to Congress . . . . [which] shall contain: (1) such information and data collected by the Commission as may be considered of value in the determination of questions connected with the regulation of interstate and foreign wire and radio communication and radio transmission of energy; . . . and (4) specific recommendations to Congress as to additional legislation which the Commission deems necessary or desirable. . . ."[16] Thus, the Communications Act authorizes the Commission to collect information it needs to perform its duties, and wireline service disruption reporting has assisted us in that effort. In the case of wireline carriers, outage reports have triggered investigations and, where sufficient cause for concern existed, we initiated corrective actions with those carriers. Service disruption reports have also been used, on a continuing basis, to analyze wireline vulnerabilities. This, in turn, has assisted the Network Reliability and Interoperability Council in developing industry best practices and in making recommendations to the Chairman with regard to

---

[11] For a very localized example of this, see "The Economic Effects of September 11," *Economic Policy Review*, Federal Reserve Bank of New York, Vol. 18, No.2 (Nov. 2002), at 46 (On September 12, 2001, Government Securities Corporation settlement fails were $440,000,000,000.00.).

[12] *See, e.g.,* DHS Comments at 6-7.

[13] Communications Act of 1934, 48 Stat. 1064, as amended, 47 U.S.C. § 151 *et seq.* (hereinafter, "the Act" or "the Communications Act").

[14] Section 1 of the Act, 47 U.S.C. § 151 (emphasis supplied). All subsequent sections of the Act are to be read, and construed, in light of the statements of purpose that are contained in Section 1 of the Act. *U.S. v. Southwestern Cable Co.,* 392 U.S. 157, 167-168, 172-173 (1968); *see also Building Owners and Managers Assoc. Int'l. v. FCC,* 254 F.3d 89, 94 (D.C. Cir. 2001) *and* Sections 4(i)-(j) and 403 of the Act, 47 U.S.C. §§ 154(i)-(j), 403 (additional authority to acquire information needed to perform the Commission's responsibilities).

[15] Section 4(o) of the Act, 47 U.S.C. § 154(o) (emphasis supplied).

[16] Section 4(k) of the Act, 47 U.S.C. § 154(k). More generally, Section 4(i) of the Act, 47 U.S.C. § 154(i), provides that the "Commission may perform any and all acts . . . and issue such orders, not inconsistent with this Act, as may be necessary in the execution of its functions."

proposed mandatory reporting requirements.[121] There simply is no persuasive evidence in the record that, as this Commission and DHS require, *all* covered communications providers would voluntarily file accurate and complete outage reports for the foreseeable future or that mandatory reporting is not essential to the development, refinement, and validation of best practices.[122]

40.      Finally, we agree with DHS and the overwhelming majority of commenting parties that the outage reporting data we seek to collect will contain data that, though useful for the analysis of past and current outages in order to increase the reliability and security of telecommunications networks in the

---

[121] We note that many of the assertions by ILORI's proponents are factually incorrect. The Commission has never been invited to participate in ILORI (in fact, a Commission staff member who recently sought to attend an ILORI meeting was asked to leave that meeting). The Commission has no access to information filed through ILORI. In addition, as stated above, the record is unclear as to how many service providers fully participate in ILORI and, of those, how many have been filing outage information that is accurate and complete. See *supra* ¶¶ 34-35 & nn. 75, 110, 113. Finally, we have observed that, as of August 3, 2004, the ATIS/ NRSC website made no reference to ILORI, and the minutes of the March 10 and June 10, 2004 meetings of the NRSC make no reference to ILORI.

[122] A number of commenting parties state that we overestimated the importance of mandatory outage reporting in facilitating the collaborative industry self-improvement efforts in the area of network reliability. Some of these parties assert that only 5% of the existing best practices can be attributed to information obtained as a result of the Commission's outage reporting regime. The basis for this 5% assertion is not explained by any of these parties, nor is the method of its calculation explained. It is, at best, a misleading figure that seriously underestimates the value of our mandatorily required outage reports in the development, and subsequent validation, of best practices. Of the 777 Best Practices, only 261 Best Practices address network reliability, which is the primary focus of outage data collection. The original 175 Best Practices from the first Network Reliability Council were based on industry outage/failure data including FCC required outage data (see Network Reliability: A Report to the Nations, Signaling Network Systems Technical Paper, at 2(NRC, June 1993).

Subsequent analyses of mandatory outage data showed an alarming increase in the number of outages in several areas. As a consequence, teams of telecommunications industry experts were formed to address those trends. One team addressed facility cable cuts/failures, with the result that 29 new Best Practices were added to the then-existing 26 Best Practices aimed at reducing the number of facility cable cuts/failures. A second team was formed to address the marked increase in FCC outages with a procedural cause, and after analyzing FCC outage data, the team developed 26 new Best Practices. A third team used FCC outage report data to study outages caused by timing problems. In this respect, thirty three percent of SS7 outages were then due to timing problems. This team developed three new Best Practices along with many other recommendations.

By contrast, the efforts and results that have resulted from the *voluntary* outage reporting initiatives have been underwhelming. The City of New York *et. al.* and this Commission are not aware of a single new or modified Best Practice that has resulted from voluntary outage report trials for wireless communications conducted pursuant to NRIC V or NRIC VI. Contrary to the claim by Cingular and Verizon Wireless that many best practices are only applicable to wireless carriers, there are no best practices applicable exclusively to wireless carriers. Of the 729 best practices applicable to wireless, 723 of them were developed originally for, and currently are applicable to, wireline communications, and all six of the remaining Best Practices are also applicable to satellite and to cable. On the other hand, mandatory outage reports have been useful over the years in helping to identify which Best Practices are the most important for preventing future outages from similar causes. Each quarterly report of the Network Reliability Steering Committee (NRSC) reiterates that one of NRSC's missions is to analyze network outage data in order to "make recommendations aimed at improving network reliability." *See, e.g.,* Network Reliability Steering Committee, 1st Quarter Report 2004, at 2. Notably, the first paragraph of the Executive Summary for this report states, "The Network Reliability Steering Committee (NRSC), under the auspices of the Alliance for Telecommunications Industry Solutions, was formed to monitor network reliability utilizing major outage reports filed with the Federal Communications Commission (FCC) per Docket 91-273. The Committee's mission is to analyze network outage data reported by companies, identify trends, make recommendations aimed at improving network reliability...." In summary, we find, despite the contrary assertions of several commenting parties, that substantially more than 5% of the existing Best Practices were developed or improved based, at least in part, on data acquired through our existing mandatory outage reporting regime.

future, could be used by hostile parties to attack those networks, which are part of our Nation's critical information infrastructure. DHS states that the following information should be protected: "direct and root cause(s); duration of the disruption; the range and types of services affected; the scope and gravity of the impact across all platforms and geographic area; specific equipment failures; the specific network element(s) impacted; remedial measures and/or best practices applied; and an appraisal of the effectiveness of best practices."[123]

41.      Although some commenting parties have suggested that information in outage reports can only be protected from public disclosure if it is "voluntarily" submitted to DHS directly, pursuant to statutory provisions concerning the "protection of voluntarily shared critical infrastructure information,"[124] this assertion is not correct. The Critical Infrastructure Information Act of 2002 on which those commenting parties rely, states specifically that "[n]othing in this section shall be construed to limit or otherwise affect the ability of a State, local, or Federal Government entity, agency, or authority, or any third party, under applicable law to obtain critical infrastructure information in a manner not covered by [the 'voluntary submission' subsection] of this section . . ."[125] In addition, before voluntarily submitted information is entitled to protection, the DHS must first review it and make an affirmative determination as to whether that information does, or does not, qualify as Critical Infrastructure Information ("CIII"). [126] It is quite possible that some outage information that may not be found to qualify as CII by the DHS will nevertheless be needed by the Commission to fulfill its responsibilities under the Communications Act. Finally, Homeland Security Presidential Directive 7 ("HSPD 7"), upon which the commenting parties also rely, states that federal agencies will appropriately protect sensitive information, "*including handling voluntarily provided information and information that would facilitate terrorist targeting of critical infrastructure and key resources . . . .*"[127] In this regard, we stress that while HSPD-7 *includes* voluntarily submitted information, it *does not exclude* mandatorily submitted information from protection.

42. Likewise, the provisions of the Critical Infrastructure Act do not affect the applicability of exemptions from the requirement of public disclosure in the Freedom of Information Act (FOIA), including FOIA Exemption 4,[128] nor the provisions of the Trade Secrets Act[129] that protect commercial information submitted to the Commission. We recognize that the competitive landscape of the communications industry has changed dramatically since we first began requiring these reports from wireline carriers nearly 15 years ago. In addition, our decision here to require reports from wireless and

---

[123] DHS Comments at 14. *See also* Letter for Eric T. Werner, Esq., Office of General Counsel, U.S. Department of Homeland Security, to Jeffery M. Goldthorp, Chief, Network Technology Division, Federal Communications Commission (Aug. 3, 2004)(identifying additional types of harm that could result from disclosure of these types of information).

[124] *See* 6 U.S.C. § 133(a).

[125] 6 U.S.C. § 133(c)("independently obtained information"). *See also* 6 U.S.C. § 133(d)("Treatment of voluntary submittal of information") which states:: "[t]he voluntary submittal to the government of information or records that are protected from disclosure by this subtitle shall not be construed to constitute compliance with any requirement to submit such information to a Federal agency under any other provision of law.")

[126] *Procedures for Handling Critical Infrastructure Information; Interim Rule,.* 69 Fed. Reg. 8074, published Feb. 20, 2004 (DHS), adopting interim rules to be codified at 6 C.F.R. §§ 29.1-29.9 (2004). See also AT&T Comments at n.30; DHS Reply at 5 (DHS has authority to protect voluntarily submitted information *under certain circumstances*).

[127] HSPD 7, Part 10 (emphasis supplied).

[128] 5 U.S.C. § 552(b)(4)(agencies may withhold "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential").

[129] 18 U.S.C. § 1905.

satellite carriers, as well as to require more extensive information in the reports, demands that we reassess the potential competitive sensitivity of this information. The Commission also has an independent obligation to consider whether disclosure of such commercially sensitive information is authorized under provisions of our rules that permit disclosure only for persuasive reasons.[130]

43. In circumstances in which commercial information is required to be submitted to the government, FOIA exemption 4 permits us to withhold such records where release would likely cause substantial harm to the competitive position of the submitting party.[131] As a general matter, the harm must flow from affirmative use of the information by competitors and not consist solely of injuries that flow from customer disgruntlement or public embarrassment.[132] Reviewing courts have not yet addressed whether more direct types of harm, such as threats to the security of communications facilities, fall within the exemption, but a terrorist attack on a submitter's facilities clearly would result in direct commercial and financial harm to the submitter's business operations.

44. In any event, commenters in this proceeding point specifically to the likelihood of substantial competitive harm from the disclosure of outage reports to competitors. Wireline carriers, for example, state that information contained in the outage reports that they have filed already has been used by competitors to wage marketing campaigns,[133] and the likelihood of competitive harm is implicit in the comments of many others. We note that there is emerging intramodal and intermodal competition from cable broadband service providers and other carriers. Moreover, future reports will likely contain more detailed information about outages associated with specific switch manufacturers and operators that, if available to other switch manufacturers, could be used to gain competitive advantage in the highly competitive market for switching equipment.[134] Representatives of the satellite industry likewise point to the competitive sensitivity of the information that will be submitted for fixed satellite and mobile satellite operators.[135] Similarly, representatives of the wireless industry emphasize the highly competitive nature of the wireless industry and the importance of service outages on customer satisfaction.[136] Competitors presumably would have ample incentives to utilize outage information to compete for wireless customers. Indeed, even the joint comments of the City of New York, the National League of Cities, and NATOA emphasize that the incentives for the voluntary submission of this data are greatly affected by the "possible adverse marketplace reaction, stemming from making known to the public the true scope and frequency of its own service disruptions."[137]

---

[130] *See* Examination of Current Policy Concerning the Treatment of Confidential Information Submitted to the Commission, 13 FCC Rcd 24816, 24827-28 (1998), *recon. den.*, 14 FCC Rcd 20128 (1999).

[131] *See* Critical Mass Energy Project v. NRC, 975 F.2d 871, 880 (D.C. Cir. 1992) (en banc); National Parks & Cons. Ass'n v. Morton, 498 F.2d 765 (D.C. Cir. 1974).

[132] *See, e.g.*, CNA Fin. Corp. v. Donovan, 830 F.2d 1132, 1152, 1154 & n.158 (D.C. Cir. 1987); Public Citizen Health Research Group v. FDA, 704 F.2d 1280, 1291 n.30 (D.C. Cir. 1983); Gen. Elec. Co. v. NRC, 750 F.2d 1394, 1402 (7th Cir. 1984); Center to Prevent Handgun Violence v. United States Dep't of the Treasury, 981 F. Supp. 20, 23 (D.D.C. 1997).

[133] BellSouth Comments at 27; SBC Comments at 22; SBC Reply Comments at 6.

[134] Lucent Comments at 3.

[135] PanAmSat and /SES Americom Joint Comments at 7; GlobalStar Comments at 7; Inmarsat Reply Comments at 2.

[136] Cingular Comments at 11-12; Dobson Communication Corporation Reply Comments at 7; Verizon Wireless Reply Comments at 4.

[137] City of New York *et al,* Joint Comments at 11.

45. Given the competitive nature of many segments of the communications industry and the importance that outage information may have on the selection of a service provider or manufacturer, we conclude that there is a presumptive likelihood of substantial competitive harm from disclosure of information in outage reports. In addition, under FOIA Exemption 4 we are also obliged to consider any adverse impact that disclosure might have on government programs, including the impact on the Commission's ability to implement its statutory responsibility under section 1 of the Act[138] to ensure that communications services are adequate to protect "national defense" and promote "safety of life and property."[139] The record in this proceeding, including the comments of the Department of Homeland Security, demonstrate that the national defense and public safety goals that we seek to achieve by requiring these outage reports would be seriously undermined if we were to permit these reports to fall into the hands of terrorists who seek to cripple the nation's communications infrastructure. In addition, release of this information could also make regulated entities less forthright in the information submitted to the Commission at a time when it is especially critical that we obtain full and accurate information in order to prevent harm to the communications infrastructure. Accordingly, the potential consumer benefits that we pointed to over a decade ago as a public interest factor weighing against routine treatment of outage reports as confidential information, are now substantially outweighed by the potential harm to the public and national defense that might result from disclosure.[140] Accordingly, and although decisions with respect to specific records and the specific basis for withholding them must be made in the context of considering the facts underlying any individual Freedom of Information Act requests, including consideration of the specific types of competitive injury that submitters point to in those cases, we will amend our rules to provide that outage reports are presumptively protected from public disclosure under the FOIA.

46. In sum, based on the record before us, we find no persuasive evidence that a voluntary program would be workable. We therefore adopt our proposal to extend mandatory outage reporting to non-wireline communications providers, and we will treat information in all outage reports as confidential information that is exempt from routine public disclosure under FOIA.[141] We note, however, that the analytical substance of these reports is essential to the development and validation of best practices. As a consequence, we will also use information from those reports in analyses that will enable us to provide guidance to the Network Reliability and Interoperability Council, the Network Reliability Steering Committee and other organizations. We will do so, however, in a way that does not provide sensitive information to those who might use it for hostile, or competitive, purposes.[142]

---

[138] 47 U.S.C. § 151.

[139] *See, e.g.,* Critical Mass, 975 F.2d at 879 (recognizing third, program impairment prong of Exemption 4); 9 to 5 Org. for Women Workers v. Bd. Of Governors of the Fed. Reserve Sys., 721 F.2d 1, 10 (1st Cir. 1983); Pub. Citizen Health Research Group v. NIH, 209 F. Supp. 2d 37, 42-43 (D.D.C. 2002) (alternative holding); Allnet Comm. Srvs. V. FCC, 800 F. Supp. 984, 990 (D.D.C. 1992).

[140] Amendment Of Part 63 Of The Commission's Rules To Provide For Notification By Common Carriers Of Service Disruptions, CC Docket No. 91-273, *supra* note 3, 7 FCC Rcd 2010 at ¶¶ 31-32 (1992). It is no longer the case that "[c]oncerns of . . . aiding saboteurs resulting from disclosure are not supported." *Id.* at ¶31.
[141] *See* Sections 0.457, 0.459 of the Commission's Rules, 47 C.F.R. §§ 0.457, 0.459. DHS's perception in this regard is co-incident with our own. *See* DHS Comments at 14 ("While this information is critical to identify and mitigate vulnerabilities in the system, it can equally be employed by hostile actors to identify vulnerabilities for the purpose of exploiting them.").

[142] This may take the form, for example, of providing direct assistance to developers of Best Practices who address sources of outage problems. This would be consistent with previous efforts by our staff who, by analyzing outage reports, were able to provide detailed guidance to the Network Reliability Steering Committee and Network Reliability and Interoperability Councils.

EXHIBIT 2

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of

_____ [print or type full address], declare under penalty of perjury

that I have read in its entirety and understand the Stipulated Protective Order that

was issued by the United States District Court for the Central District of California

on [date] in the case of ***MCI COMMUNICATIONS SERVICES, INC., et al. v.***

***SKANSKA-TRAYLOR-SHEA A JOINT VENTURE, et al.***, **Case No. 5:19-cv-**

**01294.** I agree to comply with and to be bound by all the terms of this Stipulated

Protective Order and I understand and acknowledge that failure to so comply could

expose me to sanctions and punishment in the nature of contempt. I solemnly

promise that I will not disclose in any manner any information or item that is

subject to this Stipulated Protective Order to any person or entity except in strict

compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court

for the Central District of California for the purpose of enforcing the terms of this

Stipulated Protective Order, even if such enforcement proceedings occur after

termination of this action. I hereby appoint _____ [print

or type full name] of _____ [print or type

full address and telephone number] as my California agent for service of process in

connection with this action or any proceedings related to enforcement of this

Stipulated Protective Order.

Date: _____

City and State where sworn and signed: _____

Printed name: _____

Signature: _____